UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA JO GARCIA, | Case No. 12CV992-WQH (BLM) |
| Plaintiff, | **REPORT AND RECOMMENDATION FOR ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| MICHAEL J. ASTRUE, | |
| Defendant. | |
| | [ECF Nos. 12 & 16] |

Plaintiff Pamela Jo Garcia brought this action for judicial review of the Social Security Commissioner's ("Commissioner") denial of her claim for social security disability insurance benefits. See ECF No. 1. Before the Court are Plaintiff's Motion for Summary Judgment (ECF No. 12, "Pl.'s Mot.") and Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment (ECF No. 16 "Def.'s Mot." & 17 "Def.'s Opp'n")[1]. Plaintiff did not file an opposition or reply.

This Report and Recommendation is submitted to United States District Judge William Q. Hayes pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California. For the reasons set forth below, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **GRANTED** and Defendant's

---

[1] Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment appear on the docket as two documents, numbers 16 & 17. However, the content of the documents is the same. For clarity, the Court will refer to Defendant's cross-motion and opposition as one document, namely, "Def.'s Mot."

1  Cross-Motion for Summary Judgment be **DENIED**.

2  **PROCEDURAL BACKGROUND**

3  On November 21, 2008, Plaintiff filed an application for disability insurance benefits alleging
4  disability beginning January 25, 2008.  See Administrative Record ("AR") at 14.  The claim was
5  denied initially on March 20, 2009, and upon reconsideration on April 27, 2009, resulting in
6  Plaintiff's request for an administrative hearing on June 8, 2009.  Id.

7  On June 18, 2010, a hearing was held before Administrative Law Judge ("ALJ") Peter J.
8  Valentino.  Id. at 14, 23.  Plaintiff, an impartial medical expert (Woodrow W. Janese, M.D.), and
9  an impartial vocational expert (Alan E. Cummings, Ph. D.) testified at the hearing.  Id. at 14.  In
10  a written decision dated July 9, 2010, ALJ Valentino determined that Plaintiff was not disabled
11  under sections 216(I) and 223(d) of the Social Security Act.  Id. at 23.  Plaintiff requested review
12  by the Appeals Council and submitted additional evidence in support of her alleged disability.  Id.
13  at 1-5.  In a letter dated February 24, 2012, the Appeals Council found no basis for reviewing the
14  ALJ's ruling, and the ALJ's decision therefore became the final decision of the Commissioner.  Id.
15  at 1.

16  On April 23, 2012, Plaintiff filed the instant action seeking judicial review by the federal
17  district court.  See ECF No. 1.  On June 20, 2012, Plaintiff filed a motion for summary judgment
18  alleging two errors: the ALJ failed in rejecting the functional capacity assessment of Plaintiff's
19  treating neurologist and the ALJ failed to provide legally sufficient reasons for rejecting Plaintiff's
20  testimony.  See Pl.'s Mot.  Defendant filed a timely cross-motion for summary judgment and
21  opposition to Plaintiff's motion, asserting that the ALJ properly rejected the opinion of Plaintiff's
22  treating neurologist and properly evaluated Plaintiff's testimony.  See Def.'s Mot.  Plaintiff did not
23  file an opposition or reply.

24  **ALJ's DECISION**

25  On July 9, 2010, the ALJ issued a written decision in which he determined that Plaintiff was
26  not disabled as defined in the Social Security Act.  AR at 14-23.  Initially, the ALJ determined that
27  Plaintiff had not engaged in substantial gainful activity during the relevant time period (since
28  January 25, 2008).  Id. at 16.  He then considered all of Plaintiff's medical impairments and

determined that the following impairments were "severe" as defined in the Regulations: "subjective memory impairment and osteoporosis." Id.  At step three, the ALJ found that Plaintiff's medically determinable impairments did not meet or medically equal the listed impairments. Id. at 17.  In reaching this decision, the ALJ noted that "[t]he record does not report the existence of any functional limitations and or diagnostic test results, which would suggest that the impairments meet or equal the criteria of any specific listing." Id.  At step four, the ALJ considered Plaintiff's severe impairments and determined that her residual functional capacity ("RFC") permitted her to perform "medium level work with limitations to simple repetitive tasks." Id. at 18.  In reaching this decision, the ALJ found the findings of Plaintiff's treating neurologist, Dr. Frederick J. De La Vega, to be "inconsistent with the totality of the evidence" and Plaintiff's subjective symptom testimony "not fully credible." Id. at 18-20.

## STANDARD OF REVIEW

Section 405(g) of the Social Security Act permits unsuccessful applicants to seek judicial review of the Commissioner's final decision. 42 U.S.C. § 405(g).  The scope of judicial review is limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error. Id.; Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).

Substantial evidence is "more than a mere scintilla, but may be less than a preponderance." Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001) (citation omitted).  It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion." Id. (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003).  "In determining whether the [ALJ's] findings are supported by substantial evidence, [the court] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the [ALJ's] conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (citations omitted).  Where the evidence can reasonably be construed to support more than one rational interpretation, the court must uphold the ALJ's decision. See Batson, 359 F.3d at 1193.  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts. See Lewis, 236 F.3d at

1    509.

2        Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions,

3    the court must set aside the decision if the ALJ failed to apply the proper legal standards in

4    weighing the evidence and reaching his or her decision.  See Batson, 359 F.3d at 1193.  Section

5    405(g) permits a court to enter judgment affirming, modifying, or reversing the Commissioner's

6    decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the matter to the Social

7    Security Administration for further proceedings.  Id.

8                                    **DISCUSSION**

9    **A.    Treating Physician vs. Non-Examining Physician**

10        Plaintiff argues that the ALJ erred in rejecting the functional capacity assessment of

11   Plaintiff's treating neurologist, Dr. Frederick De La Vega.  Pl.'s Mot. at 12.  Specifically, Plaintiff

12   explains that because Dr. De La Vega and Dr. Valette agree on the medical findings and disagree

13   only as to the ultimate conclusion as to functional capacity, Dr. Valette's conclusion cannot

14   constitute substantial evidence able to overcome Dr. De La Vega's findings.  Id. at 16.  Defendant

15   contends that the ALJ properly rejected the opinion of Dr. De La Vega.  Def.'s Mot. at 15.

16   Defendant further contends that Dr. De La Vega "crossed the line from being an objective medical

17   source to being an advocate for his patient's application for benefits" and that Dr. De La Vega's

18   opinion "is not supported by the objective evidence or . . . by his own treatment notes."  Id.

19        1.    Plaintiff's Medical History

20        The medical records most relevant to the instant issue come from Drs. De La Vega, Valette,

21   and Janese.  Dr. Frederick De La Vega, Plaintiff's treating neurologist, began seeing Plaintiff in

22   January 2008 when he evaluated her due to the changes she had noticed with her memory.  Id.

23   at 384.  At the first appointment, Dr. De La Vega performed a mini mental status examination

24   ("MMSE") on Plaintiff and noted that she scored a 27/30 indicating possible "mild cognitive

25   impairment."  Id. at 385.  On January 18, 2008, Dr. De La Vega requested that Plaintiff get an

26   electroencephalogram and concluded that the results were "probably normal for age."  Id. at 361.

27   On February 5, 2008, Dr. De La Vega performed a lumbar puncture on Plaintiff.  Id. at 334.  Dr.

28   De La Vega and the lab technician "agreed that there was no xanthochromia visible on [the]

                                            4

1   sample when held in front of a very bright light." Id. at 335.  In March 2008, Dr. De la Vega

2   referred Plaintiff to another doctor for a sleep study where it was concluded that Plaintiff should

3   be treated with CAPP due to "obstructive sleep apnea syndrome." Id. at 551.  On June 24, 2008,

4   Dr. De La Vega had an appointment with Plaintiff and noted that she felt depressed, confused and

5   had difficulty focusing.  Id. at 538.  On August 26, 2008, after a visit with Plaintiff, Dr. De La Vega

6   noted that Plaintiff was frustrated that she was not getting better and that she was not used to

7   being at home.  Id. at 536.  During another examination with Plaintiff on April 29, 2009, Dr. De

8   La Vega noted that Plaintiff had a lot of "repetitive questions" and that she mentioned that she

9   had gotten lost while driving.  Id. at 530.

10         On July 9, 2009, Dr. De La Vega completed a document entitled Psychiatric/Psychological

11  Impairment Questionnaire.  Id. at 674-681.  In the document, Dr. De La Vega diagnosed Plaintiff

12  as having a "mild cognitive impairment (probably early Alzheimer's disease)" and found that she

13  will show a slow decline over the next nine to fourteen years.  Id.  In support of his diagnosis,

14  he indicated that Plaintiff had (1) poor memory, (2) time/place disorientation, (3) decreased

15  energy, (4) difficulty thinking, concentrating, or multitasking, and (5) that Plaintiff has to make

16  lists for everything, but then loses the lists.  Id. at 675.  Dr. De La Vega also noted various tests

17  that he performed which support the diagnosis including the (1) MMSE score of 27/30 from

18  January 8, 2008, (2)  fact that Plaintiff was only able to name eight animals in sixty seconds, (3)

19  MMSE score of 28/30 from April 22, 2008, (4)  MMSE score of 27/30 from April 29, 2009, (5) CT

20  scan from February 5, 2008, showing mild central atrophy, and (6) MRI results from February 5,

21  2008, showing "mild deep white matter ischemic change." Id.  Dr. De La Vega further explained

22  that Plaintiff is moderately limited in her ability to make simple work related decisions, respond

23  appropriately to changes in the workplace setting, carry out one or two step instructions, sustain

24  an ordinary routine without supervision, and travel to unfamiliar places or use public

25  transportation, and markedly limited in her ability to remember locations and work-like

26  procedures, understand and remember one or two step instructions, understand and remember

27  detailed instructions, carry out detailed instructions, maintain attention, and concentration for

28  extended periods, work in coordination with or proximity to others without being distracted by

them, complete a normal workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. De La Vega found Plaintiff to be mildly limited in her ability to interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans independently. Id. at 678-679.  Dr. De La Vega further found that Plaintiff was not limited in her ability to get along with coworkers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, and be aware of normal hazards and take precautions.  Id.  Dr. De La Vega considered Plaintiff to be capable of tolerating only low stress.  Id. at 680.

On July 29, 2009, Dr. De La Vega noted that Plaintiff passed her DMV test, but that Plaintiff was frustrated with her multitasking limitations and feeling worried.  Id. at 526.  On September 7, 2009, Dr. De La Vega drafted a letter summarizing his treatment of Plaintiff.  Id. at 683-684. In the letter, Dr. De La Vega stated that he sent Plaintiff to Dr. Dee E. Silver for a second opinion in April 2008 and that Dr. Silver thought Plaintiff "most likely had early Alzheimer's disease, but still in the mild cognitive impairment stage." Id. at 683.  Dr. De La Vega also stated that Plaintiff underwent neuro-psychometric testing on July 7, 2009 which revealed severe cognitive-linguistic impairment.  Dr. De La Vega considered Plaintiff to be  "fully disabled" and predicted that "it will get worse over the next couple of years." Id. at 683-684.  He concluded by stating that Plaintiff "has probably Alzheimer's type dementia and its severity is causing her major problems to the point where she cannot be employed at all any more."  Id.

Dr. Colette Valette performed a psychological consultation of Plaintiff at the request of the Department of Social Services, Disability Evaluation Department on February 18, 2009.  Id. at 489.  She administered several tests including a (1) psychological consultation, (2) Wechsler Adult Intelligence Scale III, (3) Wechsler Memory Scale - III, (4) Bender-Gestalt II, and (5) trails A and B.  Id.  Dr. Valette spoke with Plaintiff and learned that she is able to drive, handle her own finances, "take care of personal hygiene, wash dishes, vacuum, sweep, do laundry, and cook" and that she "likes to take walks, shop, make jewelry, and do crossword puzzles." Id. at 490.  After

speaking with Plaintiff and performing the various tests, Dr. Valette concluded that Plaintiff had no limitations in her ability to (1) interact with others at an age-appropriate level, (2) understand instructions; (3) sustain an ordinary routine without sustained supervision, (4) complete simple tasks, (5) complete detailed tasks, (6) concentrate for at least two hour increments at a time, in order to maintain a regular work schedule, (7) avoid normal hazards, and (8) handle funds, and that Plaintiff's memory difficulties caused slight limitations in her ability to complete complex tasks. Id. at 490-491. Additionally, Dr. Valette found Plaintiff to have a significant difference between memory scores and intellectual scores which suggested a "cognitive disorder, NOS." Id. at 490.

Dr. Woodrow W. Janese, a board-certified neurosurgeon, testified at Plaintiff's hearing after reviewing Plaintiff's medical records and hearing her testimony. Id. at 30, 47-75. Dr. Janese concluded that it was "[k]ind of strange that [Plaintiff] would have the judgment and memory to remember that she didn't have a memory." Id. at 49. He also testified that he did not agree with Dr. De La Vega's findings that Plaintiff was "markedly limited" and "would meet the listings." Id. at 52. Instead, Dr. Janese found that Plaintiff "has a mild memory loss" and is capable of performing light work without mental limitations. Id. at 53 and 61-62. Dr. Janese based his findings on a number of factors, including that (1) Plaintiff's "neurological examinations [were] normal," (2) Plaintiff was exhibiting good judgment, for example by saving her 401K monies, (3) "she didn't seem like she was handicapped for recalling memory" during her testimony, (4) she was sixty-two years old, (5) "she look[ed] pretty healthy" (6) the relevant area of medicine is a "soft science;" and (7) "[e]verybody has osteoporosis." Id. at 53-74.

On August 1, 2010, Dr. De La Vega wrote another letter to assist in Plaintiff's appeal. Id. at 827. In the letter, Dr. De La Vega noted that he administered another MMSE on July 20, 2010 and that Plaintiff's score dropped to 22/30. Id. He further stated that he disagreed with the testimony provided by Dr. Janese at Plaintiff's hearing. Id. Specifically, Dr. De La Vega disagreed with Dr. Janese's opinions that Alzheimer patients lack insight into their memory deficits, that a brain biopsy (which is very rarely used) could have objectively demonstrated whether or not Plaintiff suffers from Alzheimer's, and that Plaintiff's memory loss is typical of that experienced

1  by people of advanced age because "Plaintiff is only 62 years old and . . . . it is known that

2  Alzheimer's can afflict patients as young as age 55." Id. 827-828.  Dr. De La Vega concluded by

3  stating that Plaintiff "has progressed to the mild stage of Alzheimer's disease, does not have

4  vascular dementia or age-related memory loss," that Dr. Janese's assessment is incorrect and not

5  supported by the facts or expert opinions of dementia experts, and that Plaintiff is also not in any

6  condition to perform manual labor. Id. at 828.

7         2.    Relevant Law

8         The opinion of a treating doctor generally should be given more weight than opinions of

9  doctors who do not treat the claimant. See Turner v. Comm'r. of Soc. Sec., 613 F. 3d 1217, 1222

10  (9th Cir. 2010) (citing Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995)).  If the treating

11  doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and

12  convincing" reasons supported by substantial evidence in the record. Id. (citing Lester, 81 F.3d

13  at 830-31).  Even when the treating doctor's opinion is contradicted by the opinion of another

14  doctor, the ALJ may properly reject the treating doctor's opinion only by providing "specific and

15  legitimate reasons" supported by substantial evidence in the record for doing so. Id. (citing

16  Lester, 81 F.3d at 830-31).  This can be done by "setting out a detailed and thorough summary

17  of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making

18  findings." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing Magallanes v.

19  Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  "The ALJ must do more than offer his conclusions.

20  He must set forth his own interpretations and explain why they, rather than the doctors', are

21  correct." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (quoting Embrey v. Bowen, 849 F.2d

22  418, 421-22 (9th Cir. 1988)).

23        3.    Analysis

24        Here, Plaintiff's treating doctor's opinion was contradicted by a non-treating doctor, Dr.

25  Valette, and a non-examining, non-treating doctor, Dr. Janese.  Specifically, Dr. De La Vega

26  opined that Plaintiff suffered from a mild stage of Alzheimer's disease and not age-related

27  memory loss while Dr. Valette opined that Plaintiff's test results suggested a "cognitive disorder,

28  NOS" and Dr. Janese opined that Plaintiff has "a mild memory loss" "which commonly occurs in

1  patients of advanced age." AR at 53, 490, 828. Accordingly, the ALJ was required to provide
2  specific and legitimate reasons supported by substantial evidence for rejecting Dr. De La Vega's
3  opinion. Turner, 613 F. 3d at 1222. The ALJ failed to do so.

4      In rejecting Dr. De La Vega's opinions, the ALJ found that those opinions were
5  "inconsistent with the totality of the evidence, including his own progress notes and the opinions
6  of Dr. Valette and the state agency physicians." Id. at 18-19 (citations omitted). The ALJ also
7  found that the "objective evidence in the record [did] not support the level of severity that [Dr.
8  De La Vega] assign[ed]" and concluded that due to these "clear and convincing reasons," Dr. De
9  La Vega's "opinions [were] neither persuasive nor controlling." Id. at 19. When presenting his
10 finding, the ALJ did not provide "a detailed and thorough summary of the facts and conflicting
11 clinical evidence" nor did he "do more than offer his conclusions" or "set forth his own
12 interpretations and explain why they, rather than the doctors', are correct." Orn, 495 F.3d at 632
13 (quoting Embrey, 849 F.2d at 421-22).

14     Contrary to Defendant's arguments and the ALJ's conclusions, Dr. De La Vega's opinions
15 were not inconsistent with his own treatment notes [Def.'s Mot. at 15] or the totality of the
16 evidence [AR at 19]. Dr. De La Vega concluded that Plaintiff suffered from a mild stage of
17 Alzheimer's disease and not age related memory loss. Id. at 828. Dr. De La Vega's treatment
18 notes and the record indicate that Plaintiff (1) took a series of MMSEs and that her scores
19 continually declined [id. at 675, 824, 827 (score of 27/30 on 1/8/08, 28/30 on 4/22/08, 27/30 on
20 4/29/09), 25/30 on 11/13/09 and 22/30 on July 20, 2010], (2) probably suffered from early
21 Alzheimer's disease [id. at 674, 684], (3) had a poor memory [id. at 675], (4) suffered from time
22 and place disorientation [id.], (5) had decreased energy [id.], (6) had difficulty thinking and
23 concentrating [id.], (7) made lists for everything she had to do and that she often lost the lists
24 [id.], (8) had a CT scan that showed mild central atrophy [id. at 675 (on 2/5/08)], (9) had an MRI
25 that showed ,mild deep white matter, ischemic change [id. at 675, 830 (on 2/5/08)], and (10) had
26 lost some of her sense of smell[2] [id. at 567].

27 _____

28      [2]The smell identification test is "often an early red flag in the identification of Alzheimer's." Id. at 295.

1      None of the items listed above are inconsistent with Dr. De La Vega's opinion that Plaintiff

2  had a mild stage of Alzheimer's disease.  Additionally, the fact that throughout the treatment

3  history Dr. De La Vega states that Plaintiff *probably* has Alzheimer's disease is also not

4  inconsistent with the record nor does it indicate a lack of confidence in Dr. De La Vega's

5  diagnosis. Instead, it is more likely Dr. De La Vega was using the word probably even though the

6  symptoms and test results that he recorded were consistent with Alzheimer's because Alzheimer's

7  cannot be definitively diagnosed in living patients.[3]  This also speaks to Defendant's argument

8  that "[a]dditional tests did not confirm the diagnosis of early Alzheimer's" from Dr. De La Vega.

9  Def.'s Mot. at 17.  Since the disease cannot be confirmed definitively, Dr. De La Vega's use of the

10 word "probably" does not undermine the validity of his opinion.

11     Dr. De La Vega's opinions were inconsistent with those of Dr. Valette, however, Plaintiff

12 argues that Dr. Valette's conclusion is not substantial evidence for overcoming Dr. De La Vega's

13 conclusion as to Plaintiff's functional capacity because Dr. Valette and Dr. De La Vega based their

14 opinions on "essentially the same findings" as opposed to independent findings.  Pl.'s Mot. at 16.

15 "When an examining physician relies on the same clinical findings as a treating physician, but

16 differs only in his or her conclusions, the conclusions of the examining physician are not

17 'substantial evidence.'"  Orn, 495 F.3d at 632 (citing Murray v. Heckler, 722 F.2d 499, 502 (9th

18 Cir. 1983)).  "By contrast, when an examining physician provides 'independent clinical findings

19 that differ from the findings of the treating physician,' such findings are 'substantial evidence.'"

20 Id. at 632 (quoting Miller v. Heckler, 770 F.2d 845, 849 (9th Cir. 1985); accord Andrews v.

---

[3] See National Institute of Health, National Institute on Aging (publication date September 2012, last updated (November 26, 2012)), http://www.nia.nih.gov/alzheimers/publication/alzheimers-disease-fact-sheet (stating that although "doctors now have several methods and tools to help them determine fairly accurately whether a person who is having memory problems has 'possible Alzheimer's dementia' (dementia may be due to another cause) or 'probable Alzheimer's dementia' (no other cause for dementia can be found)," Alzheimer's disease can be definitively diagnosed only after death, by linking clinical measures with an examination of brain tissue and pathology in an autopsy); see also Cleveland Clinic (last updated on June 27, 2011), http://my.clevelandclinic.org/disorders/alzheimers_disease/hic_alzheimers_disease_overview_of_diagnostic_tests.aspx (stating that "with thorough testing and a "process of elimination," doctors today can diagnose probable Alzheimer's disease with almost 90% accuracy," but that "Alzheimer's disease cannot be definitely diagnosed until after death, when the brain can be closely examined for certain microscopic changes caused by the disease."); and Alzheimer's Foundation of America, http://www.alzfdn.org/AboutAlzheimers/diagnosis.html (stating that "[c]linicians can now diagnose Alzheimer's disease with up to 90 percent accuracy. But it can only be confirmed by an autopsy, during which pathologists look for the disease's characteristic plaques and tangles in brain tissue.").

12cv992-WQH (BLM)

<u>Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995)).  Independent clinical findings can be diagnoses that differ from those offered by another physician and that are supported by substantial evidence, or findings based on objective medical tests that the treating physician has not herself considered. <u>Id.</u> (citing <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1985) and <u>Andrews</u>, 53 F.3d at 1041).

Here, Dr. Valette based her conclusion on an independent evaluation of Plaintiff.  AR at 489.  The evaluation included a wide variety of tests and considered Plaintiff's personal and psychiatric history as well as Dr. Valette's observations of Plaintiff.  <u>Id.</u>  However, nearly identical tests were performed by Plaintiff's treating doctors and, in some instances, with similar results. <u>Id.</u> at 490.  While Dr. Valette did perform some tests that according to the record, may have not been performed by Plaintiff's treating doctors, it is unclear from the record whether the additional tests provided new or different information than that considered by Dr. De La Vega and Plaintiff's other treating physicians, which could then support a contrary conclusion that constitutes substantial evidence.[4]  <u>Orn</u>, 495 F.3d at 632.

Moreover, while Dr. De La Vega's conclusion is inconsistent with the conclusions of "Dr. Valette and the state agency physicians," it is consistent with Dr. Wayne Levin's opinion, Plaintiff's treating doctor after Plaintiff transferred from Scripps to Kaiser in August 2009, who noted that Kaiser neurology felt that Plaintiff had Alzheimer's.  <u>Id.</u> at 686.  And it is consistent with Dr. Silver's conclusion that Plaintiff's condition "seems to fit with early Alzheimer's disease" and that he could not "document absolute dementia" [<u>id.</u> at 540] and Dr. Mark McDonough's opinion that Plaintiff's workup shows results that are "consistent with elements of a profile of Alzheimer's disorder," even though he stated that additional clinical information was needed to formally make the diagnosis.  <u>Id.</u> at 295.  Accordingly, while Drs. De La Vega and Valette reached contrary conclusions, Dr. Valette's opinion does not constitute the requisite substantial evidence.

Finally, Defendant contends that Dr. De La Vega "crossed the line from being an objective medical source to being an advocate for his patient's application for benefits."  Def.'s Mot. at 15.  In support, Defendant cites to <u>Matney v. Sullivan</u>, 981 F.2d 1016, 1020 (9th Cir. 1992) where the

---

[4]Dr. Janese's conclusions are not substantial evidence for overcoming Dr. De La Vega's conclusions because Dr. Janese, a non-treating and non-examining doctor, did not conduct an independent examination of Plaintiff or base his opinions on "independent clinical findings that differ[ed] from the findings of" Dr. De La Vega.

court found that the ALJ properly determined that the treating physician's opinions "were entitled to less weight because he had agreed to become an advocate and assist in presenting a meaningful petition for Social Security benefits." Id. Matney, however, is distinguishable from the instant matter because the treating physician in Matney "examined [the plaintiff] only one time and produced a brief report." Matney, 981 F.2d at 1020. Additionally, the treating physician in Matney based his conclusions primarily upon the medical history and subjective complaints of plaintiff. Id. In this instant matter, Dr. De La Vega examined and treated Plaintiff on numerous occasions from 2008-2010 and completed several reports, letters and forms. AR at 334, 384, 361, 536, 674-681. Dr. De La Vega's findings were not based only on Plaintiff's medical history and subjective complaints, but also took into consideration her performance on many objective tests, findings from her MRI, and personal observations. Id. at 683, 827-828. Moreover, while Dr. De La Vega's 2010 letter does support his diagnosis, it also properly provides new and relevant test results and undercuts the medical bases for Dr. Janese's opinion. There have been no findings, allegations, or evidence that Dr. De La Vega has presented false statements in support of Plaintiff or that any other improper activity has taken place. In light of these facts, and the fact that the ALJ did not raise this issue in his opinion, the Court finds that Dr. De La Vega was not improperly advocating for Plaintiff and that he is an appropriate objective medical source. See Vasquez v. Astrue, 2012 WL 947207, *12, (E.D. Cal. March 20, 2012) (finding that the "fact that Dr. Amsden considered Plaintiff's subjective complaints of pain in combination with other objective medical evidence and his own observations of her condition is not substantial evidence of bias or advocacy" where doctor saw plaintiff regularly for a period of eight years and there was no evidence of Plaintiff providing "demonstrably false statements").[5]

---

[5]See also Santos v. Astrue, 2011 WL 3875705, *5, (E.D. Cal. Sept. 1, 2011) (finding that the ALJ did not properly point to any evidence of impropriety on the part of plaintiff's doctor and that the ALJ "improperly simply assumed that Dr. Upshaw's opinion was influenced by a desire to advocate on plaintiff's behalf"); Gabree v. Astrue, 2009 WL 1139577, *7, (E.D. Cal. April 28, 2009) (stating that "the mere allegation that the treating psychiatrist was acting as an advocate is not a clear and convincing reason for rejecting the treating psychiatrist's opinion regarding limitations and mental residual functional capacity" where there was no evidence or impropriety with regard to the doctor's opinion); and Lester v. Chater, 81 F.3d 821, 832 (9th Cir. 1995) (stating "[t]he Secretary may not assume that doctors routinely lie in order to help their patients collect disability benefits. While the Secretary may introduce

1    In sum, Dr. De La Vega's opinions were consistent with the totality of the evidence, his

2  progress notes, and the opinions of several of Plaintiff's treating physicians. The fact that Drs.

3  Janese and Valette reached different conclusions based on the exact same or very similar medical

4  evidence does not translate into a specific and legitimate reason for rejecting Dr. De La Vega's

5  opinion of Plaintiff's functional capacity.

6  **B.    Subjective Symptom Testimony**

7    Plaintiff's second argument is that the ALJ erred in finding that Plaintiff's symptom

8  testimony was not credible.  See Pl.'s Mot. at 17.  Plaintiff alleges that the ALJ's credibility finding

9  "is nothing more than a boilerplate collection of the objections and critiques most popular among

10  ALJs" and that his rationales are invalid and repetitive without explanation or substantial evidence.

11  Id. at 17-22.  Defendant contends that the ALJ's credibility finding is supported by substantial

12  evidence.  Def.'s Mot. at 18.

13    Neither party contests the ALJ's determination that Plaintiff has the following legally severe

14  impairments: "subjective memory impairment and osteoperosis."  See AR at 16; see also Pl.'s

15  Mot.; Def.'s Mot.   Nor do the parties contend that the ALJ improperly determined that the

16  symptoms claimed by Plaintiff could reasonably be caused by Plaintiff's severe impairments.  See

17  AR at 19; see also Pl.'s Mot.; Def.'s Mot.  In addition, neither party alleges that the ALJ found that

18  Plaintiff was malingering.[6]  As a result, the ALJ must provide clear and convincing reasons for

19  rejecting Plaintiff's subjective claims regarding her symptoms.  See Lingenfelter v. Astrue, 504

20  F.3d 1028, 1036 (9th Cir. 2007).  Plaintiff argues that the ALJ failed to comply with this mandate

21  whereas Defendant asserts that he did.  See Pl.'s Mot. at 17-20; see also Def.'s Mot. at 18-21.

22    1.    Relevant Law

23    The Ninth Circuit has established a two-part test for evaluating a claimant's subjective

24  symptoms.  See Lingenfelter, 504 F.3d at1036.  "First, the ALJ must determine whether the

25

26  evidence of actual improprieties, no such evidence exists here.").

27    [6]The ALJ made no finding that Plaintiff was malingering, nor does the evidence suggest Plaintiff was doing

28  so.

claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. (citation and internal quotation marks omitted).  The claimant, however, need not prove that the impairment reasonably could be expected to produce the alleged degree of pain or other symptoms; the claimant need only prove that the impairment reasonably could be expected to produce some degree of pain or other symptom. Id.  If the claimant satisfies the first element and there is no evidence of malingering, then the ALJ "can [only] reject the claimant's testimony about the severity of her symptoms ... by offering specific, clear and convincing reasons for doing so." Id. (citation and internal quotation marks omitted).  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Reddick, 157 F.3d at 722 (quoting Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995)).  The ALJ's findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit [Plaintiff's] testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing the claimant's testimony, "an ALJ may consider ... reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." Orn, 495 F.3d at 636.  An ALJ also may consider the claimant's work record, daily activities, and testimony from doctors and third parties regarding the "nature, severity, and effect of the symptoms" of which the claimant complains. Thomas, 278 F.3d at 958-59; see also, 20 C.F.R. § 404.1529(c)).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. See Thomas, 278 F.3d at 959.

2.    Analysis

The ALJ stated the following reasons for finding that Plaintiff's pain and symptom testimony was not credible: (1) "the objective medical evidence [did] not show pathology reasonably likely to cause the debilitating symptoms alleged;" (2) "all testing was negative except for her subjective complaints of memory loss;" (3) "[Plaintiff's] treatment has been routine or conservative in

14

1   nature;" (4) gaps in treatment indicate that Plaintiff's "symptoms and limitations have not been

2   as serious as has been alleged;" (5) "[t]here is no twelve month period where the [Plaintiff's]

3   limitations provided disability;" (6) Plaintiff "has not undergone any intensive pain regimen or

4   therapy;" (7) Plaintiff completed the DMV form and passed her driver's test in July 2009; (8)

5   Plaintiff "does not exhibit any significant disuse muscle atrophy, loss of strength, or difficulty

6   moving that is indicative of severe and disabling pain;" (9) Plaintiff's "subjective complaints of

7   severe memory loss are not supported by the medical evidence;" (10) Plaintiff's "current

8   functioning is not severely impaired" because she still drives and manages her own funds; (11)

9   Plaintiff takes medication that has been "relatively effective in controlling" her symptoms and has

10  not caused any side effects; (12) Plaintiff was able "to participate in the administrative hearing

11  and respond to the questioning without any apparent difficulties;" and (13) Plaintiff's daily

12  activities.  AR at 19-20.  The Court will consider the validity of each stated reason.

13                    A.    The Objective Medical Evidence

14          The ALJ found that the objective medical evidence [did] not show pathology reasonably

15  likely to cause the debilitating symptoms alleged, "all testing was negative except for [Plaintiff's]

16  subjective complaints of memory loss," Plaintiff's "subjective complaints of severe memory loss

17  are not supported by the medical evidence, and Plaintiff's "statements regarding her inability to

18  perform work activities are not supported by the medical evidence in the file."  Id. at 19-20.

19          In determining that the objective evidence of Plaintiff's memory loss was inconsistent with

20  Plaintiff's claimed symptoms, the ALJ analyzed all of the relevant medical records.  Id. at 18-21.

21  In doing so, the ALJ highlighted the conclusions of Drs. De La Vega, Tashjian, Valette, and

22  Janese.  Id.  The ALJ concluded that Dr. De La Vega's opinions were not supported by substantial

23  evidence in the record and were inconsistent with his own notes and the opinions of Dr. Valette

24  and the state agency physicians.  Id. at 18-19.  The ALJ noted that in a Psychiatric Review

25  Technique dated March 5, 2009, Dr. R Tahjian, a non-treating/examining state psychiatric

26  consultant "determined that the objective medical evidence supported a finding that the [Plaintiff]

27  had a cognitive disorder, not otherwise specified" and that Plaintiff is "mildly restricted" in

28

1  activities of daily living and maintaining social functioning and moderately limited in her ability to

2  maintain concentration, persistence, and pace.  Dr. Tashjian found no repeated episodes of

3  decompensation.  Id. at 20, 492-502.  In a document entitled Mental Residual Functional Capacity

4  Assessment also dated March 5, 2009, Dr. Tashjian concluded that Plaintiff was not significantly

5  limited in most of her abilities[7] and was only moderately limited in her ability to understand and

6  remember detailed instructions, and to carry out detailed instructions.  Id. at 21, 503-505.

7  Finally, the ALJ stated that Dr. Janese's opinions were based on clinical findings consistent with

8  the records as a whole, and persuasive and the ALJ adopted them in full.  Id. at 21.

9      As previously discussed, there is a large amount of evidence that does not support the

10  ALJ's determination and that evidence comes from Plaintiff's treating physician, Dr. De La Vega.

11  And, contrary to the ALJ's determination, Dr. De La Vega's opinion was supported by substantial

12  evidence in the record and was not inconsistent with his own notes.  Accordingly, the objective

13  medical evidence does support the symptoms alleged.  Even if the ALJ is correct and Plaintiff's

14  subjective symptoms are not consistent with the objective medical evidence, the absence of

15  objective medical evidence to support plaintiff's subjective complaints cannot be the sole factor

16  an ALJ uses to discredit symptom testimony.  See Reddick, 157 F.3d at 722 (citing Bunnell, 947

17  F.2d 341, 343 (9th Cir. 1991)[8].  Thus, this reason is not sufficient unless there is at least one

18  _____

19  [7] Specifically her ability to remember locations and work-like procedures, understand and remember very
short and simple instructions, carry out very short and simple instructions, maintain attention and concentration for

20  extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary
tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others

21  without being distracted by them, make simple work-related decisions, complete a normal work week without
interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable

22  number and length of rest periods, interact appropriately with the general public, ask simple questions or request
assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or

23  peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and to adhere
to basic standards of neatness and cleanliness, respond appropriately to changes in work setting, be aware of normal

24  hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic
goals or make plans independently of others.  Id. at 503-505.

25

26  [8] See also Stuter v. Astrue, 2009 WL 2824740, *6 (E.D.Cal. Sept. 1, 2009) (stating that "[t]he asserted lack
of objective medical evidence in support of plaintiff's subjective symptom testimony is not an acceptable reason, much

27  less a convincing reason, for rejecting plaintiff's subjective testimony. Reliance on such a reason is inconsistent with
the principle that once a claimant has presented medical evidence of an underlying impairment, the ALJ may not

28  discredit the claimant's testimony regarding subjective symptoms merely because the severity of the symptoms is not

1    other reason for rejecting Plaintiff's subjective symptoms which, as described below, there is not.

2              B.    Conservative Treatment

3         Another reason stated by the ALJ for discounting Plaintiff's symptom testimony was that

4    "[Plaintiff's] treatment has been routine or conservative in nature" meaning Plaintiff "has not

5    undergone any intensive pain regimen or therapy," and that Plaintiff "does not exhibit any

6    significant disuse muscle atrophy, loss of strength, or difficulty moving that is indicative of severe

7    and disabling pain." Id. at 19.

8         An ALJ is permitted to consider the nature of Plaintiff's treatment in his assessment of

9    Plaintiff's credibility.  See Parra v. Astrue, 481 F.3d 742, 750-51 (9th Cir. 2007) (stating that

10   evidence of conservative treatment is sufficient to discount a claimant's testimony regarding

11   severity of an impairment); see also Tommasetti, 533 F.3d 1035, 1039 (9th Cir. 2008) (stating

12   that the ALJ's finding that plaintiff's favorable response to conservative treatment including

13   physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve

14   stimulation unit, and a lumbosacral corset undermined plaintiff's reports regarding the disabling

15   nature of his pain was permissible); and Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999)

16   (rejecting subjective pain complaints where petitioner's "claim that she experienced pain

17   approaching the highest level imaginable was inconsistent with the 'minimal, conservative

18   treatment' that she received).  Here, however, the ALJ's finding that Plaintiff's care was too

19   conservative for a disabling condition is not supported by substantial evidence.

20        In making his finding, the ALJ fails to provide any detail or explanation as to how the

21   conservative treatment Plaintiff received for her alleged Alzheimer's supports the ALJ's finding that

22   Plaintiff was not credible, and makes no suggestion as to what other type of treatment Plaintiff

23   should have sought.  Id. at 19.  In fact, the ALJ's only comment on the subject is that the

24

25   supported by objective medical evidence"); Mossett v. Astrue, 2008 WL 2783177, *4 (C.D.Cal., July 17, 2008) (citing
     Bunnell, 947 F.2d at 346-347 (an ALJ may not discredit a claimant's testimony and deny disability benefits solely
26   because the degree of pain alleged by the claimant is not supported by objective medical evidence)); and Robbins
     v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006)(stating that "while an ALJ may find testimony not credible in
27   part or in whole, he or she may not disregard it solely because it is not substantiated affirmatively by objective
     medical evidence") (citing SSR 96-7p and Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)).

28

Plaintiff's "treatment has been routine or conservative in nature," that Plaintiff "has not undergone any intensive pain regimen or therapy which would have precluded her from performing activities at the above exertional level on a sustained basis for a period of 12 or more continuous months," and that Plaintiff "does not exhibit any significant disuse muscle atrophy, loss of strength, or difficulty moving that is indicative of severe and disabling pain." Id.

The medical records show that Plaintiff has undergone intensive testing and tried a variety of medication since she began seeking medical attention for the problems with her memory. Plaintiff has undergone an MRI [id. at 384], multiple MMSEs [id. at 827], Bender-Gestalt II [id. at 490], neuropsychometric testing [id. at 292], the Wechsler Memory Scale test [id.], the Wechsler Adult Intelligence Scale test [id. at 490], a Million Clinical Multiaxial Inventory III [id.], a smell identification test [id. at 292], the Stroop Color-Word Naming Test [id.], and the Wisconsin Card Sorting Test [id.]. She has also been prescribed and taken the Exelon 9.5 mg patch [id. at 247, 278, 827], Namenda 10 mg b.i.d. [id. at 247, 278, 827], Ginkgo Biloba [id. at 441], and Aricept [id. at 325, 357, 384] for her memory problems and Neuroritin [id. at 278] and Oxocodone/Aminophen (Percocet) [id. at 278] for her back pain.  The ALJ himself noted that Plaintiff "has been prescribed and has taken appropriate medications for the alleged impairments." Id. at 20.  Plaintiff followed the prescribed course of treatment from her various doctors and no where in the records do those doctors suggest that there are more aggressive forms of treatment available to or appropriate for Plaintiff to relieve her memory symptoms.

With respect to her osteoporosis, the ALJ again fails to provide any detail or explanation as to how the conservative treatment Plaintiff received supported the ALJ's finding that Plaintiff was not credible, and makes no suggestion as to what other type of treatment Plaintiff should have sought.  Id. at 19.  Throughout the course of her treatment, Plaintiff has been prescribed and taken Bone Assure [id. at 416, 429, 642], Calcium [id. at 416, 433, 438, 457, 594, 605, 620, 728], Vitamin D [id. at 416, 457, 620], Estrace [id. at 457], and Evista [id. at 576], and undergone bone density testing [id. at 484] and a lumbar puncture [id. at 334, 379, 463, 660]. The ALJ does not state or suggest how a more serious case of osteoporosis would be treated and

1  how that differs from the treatment that Plaintiff received.  The ALJ also does not demonstrate
2  that osteoporosis causes any "severe and disabling pain," significant "muscle atrophy, loss of
3  strength, or difficulty moving," or discomfort that would require an "intensive pain regimen or
4  therapy."[9]  Id. at 19.

5      Plaintiff's routine or conservative treatment is, therefore, not a clear and convincing basis
6  for the ALJ's negative credibility determination.

7              C.     Side Effects of Medication

8      In reaching his credibility determination, the ALJ also relied on the fact that Plaintiff takes
9  medication that has been "relatively effective in controlling" her symptoms and has not caused
10  any side effects.  Id. at 20.

11      In the appropriate situation, an "ALJ may consider the lack of side effects from prescribed
12  medications in weighing credibility."  Mossett, 2008 WL 2783177 at *5 (citing Orteza v. Shalala,
13  50 F.3d 748, 750 (9th Cir. 1995) (stating that "[a]n ALJ is clearly allowed to consider the ability
14  to perform household chores, the lack of side effects from prescribed medications, and the
15  unexplained absence of treatment for excessive pain," as well as the presentation of conflicting
16  information about drug use)).  Here, however, Plaintiff's lack of side effects from her medication
17  is not a sufficient basis for discounting her symptom testimony.

18      While the record indicates that Plaintiff did experience some side effects from her
19  medication[10], Plaintiff did not testify about any side effects from her medication or allege that she
20  is impaired and unable to work due to the side effects of her medication.  See Mosset, at *5

---

[9]See American Academy of Orthopaedic Surgeons, Osteoporosis (last reviewed August 2009), http://orthoinfo.aaos.org/topic.cfm?topic=A00232 (stating osteoporosis often develops unnoticed over many years, with no symptoms or discomfort until a fracture occurs); see also National Osteoporosis Foundation, What is Osteoporosis, http://www.nof.org/articles/7 (describing osteoporosis and stating that "[y]ou can't feel your bones becoming weaker. Often, breaking a bone is the first clue that you have osteoporosis.").

[10]Plaintiff stopped using Namenda because it "caused her to feel foggy in the head and did not help at all." Id. at 560, 566.  Plaintiff also was prescribed Evista for her osteopenia as opposed to other common drugs such as Fosamax, Actonel and Boniva because nausea had already been such an issue with Plaintiff.  Id. at 576. Plaintiff also reported that the Exelon patch "makes me sick to my stomach on occasion[.] Makes me tired during the last part of the day so I am unable to do anything" and that Namenda "make me tired and listless."  Id.  247, 273.

19

(finding that "the absence of medication side effects is immaterial to the ALJ's credibility determination in this case" and "does not constitute a clear and convincing reason to discount plaintiff's subjective testimony, as it has no bearing whatsoever on plaintiff's alleged inability to sustain substantial gainful activity" because the plaintiff did not allege that he was impaired due to the side effects of his medication" and noting that the plaintiff did not testify about the side effects of his medication, allege that he was unable to work due to his medication, or report any disabling side effects from his medication to any physician).  Additionally, the ALJ fails to address how Plaintiff's lack of side effects from her medication impacts her credibility.  As such, the ALJ's finding that Plaintiff's medication did not cause adverse side effects is not relevant to his credibility determination and does not constitute a clear and convincing reason to discount plaintiff's subjective testimony.  See Manzo v. Astrue, 2011 WL 3962254, *8 (C.D. Cal. Sept. 7, 2011) (finding that the ALJ failed to state clear and convincing reasons for rejecting plaintiff's testimony and stating "it is not clear why the ALJ referred to the lack of side effects of Plaintiff's medications, or how the lack of side effects reflected poorly on Plaintiff's credibility.  Plaintiff was prescribed pain medication by his physicians, but Plaintiff did not complain of any side effects due to the medication") (citations omitted); see also Clarke v. Astrue, 2010 WL 1540022, *16 (D. Ariz. March 31, 2012) (finding that ALJ did not explain how the management by plaintiff's treating physicians of his medications to alleviate the side effects rendered plaintiff's testimony not credible where the only other factor the ALJ mentioned in his credibility determination was that there were no reported side effects of medication that were not managed by adjustments in medication).

In addition, the ALJ's finding that Plaintiff's medications have been "relatively effective in controlling" her symptoms is not supported by substantial evidence in the record.  For example, Plaintiff was originally prescribed Aricept to help with her dementia-like symptoms and "initially it was helpful but then it started to lose its efficacy."  Id. at 641.  Also, while it is true that early in his treatment of Plaintiff, on April 22, 2008, Dr. De La Vega found that Plaintiff "certainly seem[ed] to have gotten somewhat better on low doses of medicines for dementia," [id. at 541],

1  it is also true that in his more recent letter dated September 7, 2009, Dr. De La Vega noted that

2  even thought Plaintiff was "still on memory medication," Plaintiff continued to have "cognitive and

3  memory disfunction [sic]" and was "fully disabled" and could not "be employed at all any more"

4  due to her symptoms.  Id. at 684.  Finally, on December 16, 2009, Nurse Practitioner Juany

5  Mazair, noted that Plaintiff's new combination of medication resulted in some improvement and

6  that Plaintiff was less repetitive at home and able to retain information a little bit better [id. at

7  735], but on March 26, 2010, Dr. Wayne Ira Levin, the doctor who began treating Plaintiff on

8  August 14, 2009, noted that even with the medication Plaintiff was taking for her Alzheimer's,

9  Plaintiff could not work and would "not be able to work in the future" due to memory problems.

10  Id. at 686.

11        Accordingly, while there is evidence supporting a statement that medication temporarily

12  helped Plaintiff's memory problems, there is not substantial evidence supporting the ALJ's

13  conclusion that Plaintiff's medication **controlled** her symptoms.

14                    D.    Daily Activities

15        The ALJ found that Plaintiff's allegations of debilitation were inconsistent with her activities

16  of daily life.  Specifically, the ALJ noted that Plaintiff's "current functioning is not severely

17  impaired" because she still drives and manages her own funds and,  although Plaintiff reports very

18  limited daily activities, they cannot be "objectively verified" and "it is difficult to attribute that

19  degree of limitation to the [Plaintiff's] medical condition, as opposed to other reasons."  Id. at 20.

20        In determining a plaintiff's credibility, an ALJ may consider whether a plaintiff's daily

21  activities are consistent with the asserted symptoms.  See Thomas, 278 F.3d at 958-59  (quoting

22  Light, 119 F.3d at 792); see also Social Security Ruling 96-7p (stating that "the adjudicator must

23  consider in addition to the objective medical evidence when assessing the credibility of an

24  individual's statements: [] The individual's daily activities").[11]  While the fact that a plaintiff can

25  participate in various daily activities does not necessarily detract from the plaintiff's credibility as

26

27        [11]Social Security Rulings are binding on ALJs.  See Terry v. Sullivan, 903 F.2d 1273, 1275 n. 1 (9th Cir. 1990).

28

to her specific limitations or overall disability, "a negative inference is permissible where the activities contradict the other testimony of the claimant, or where the activities are of a nature and extent to reflect transferable work skills." Elizondo v. Astrue, 2010 WL 3432261, *5 (E.D. Cal. Aug. 31, 2010). "Daily activities support an adverse credibility finding if a claimant is able to spend a substantial part of her day engaged in pursuits involving the performance of physical functions or skills that are transferable to a work setting." Id. (citing Orn, 495 F.3d at 639; Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999); and Thomas, 278 F.3d at 959. "A claimant's performance of chores such as preparing meals, cleaning house, doing laundry, shopping, occasional childcare, and interacting with others has been considered sufficient to support an adverse credibility finding when performed for a substantial portion of the day." Elizondo, 2010 WL 3432261 at *5 (citing Stubbs–Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008); Burch v. Barnhart, 400 F.3d 676, 680–81 (9th Cir. 2005); Thomas, 278 F.3d at 959; Morgan, 169 F.3d at 600; and Curry v. Sullivan, 925 F.2d 1127, 1130 (9th Cir. 1990).

Here Plaintiff testified that she (1) drives her car to the grocery store, cleaners, and gas station, (2) attends church twice a month, (3) cooks, (4) dresses herself in the morning, (5) cleans the bathroom, (6) washes the dishes, and (7) does the grocery shopping. AR at 40-47. She also testified that she sometimes gets lost during her short drives, has forgotten to turn off the stove when cooking and left the house with it on, often repeats meals because she has forgotten what she cooked the day before, relies on her husband to remind her to take her medications, and has to make lists so that she does not forget what items she needs when grocery shopping, but then forgets the list. Id. The records also reveals that Plaintiff was managing her own finances as late as February 2009 [id. at 236-327, 490, 507], but that by December 2009, her husband was handling the finances [id. at 735].

In reaching his decision, the ALJ stated that:

Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other

1
2
3

      reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.   Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.   The claimant's testimony that she cannot work is not supported by medical records.

4    <u>Id.</u> at 20 (citations omitted).   This explanation is not a sufficient basis for the ALJ's credibility

5    finding.  The above justification for the ALJ's credibility finding has been used in almost identical

6    form by other ALJs and rejected.  In <u>McKin v. Astrue</u>, 2012 WL 5250096, *4-*5 (W.D. Wash. Sept.

7    4, 2012) for example, the ALJ failed to credit plaintiff's testimony and stated:

8
9
10
11
12
13

      While the claimant has alleged daily activities that are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of the finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision. Overall, the claimant's reported limited daily activities are considered to be outweighed by other factors herein discussed. Consequently, the extreme symptoms alleged by the claimant are simply not supported by the record.

14   In concluding that the ALJ failed to provide clear and convincing reasons for his rejection of

15   plaintiff's testimony, that court noted that "simply because a fact cannot be verified objectively

16   provides little evidence to support the conclusion that the individual is not being truthful about

17   such fact in any particular instance." <u>Id.</u> at *4.  The court also noted that the ALJ's second reason

18   failed because the ALJ did "not specify what other reasons to which one can attribute the degree

19   of limitation plaintiff allege[d] that she suffer[ed]" and that "[a] ttributing the degree of limitation

20   plaintiff alleges to other reasons, when those "other reasons" are not specified, provides no

21   support for the ALJ's adverse credibility finding."[12] <u>Id.</u> at 5.  The <u>McKim</u> court went on to state

22

23
24
25
26
27
28

      [12]The <u>McKim</u> court also noted that this language had been used to support the credibility finding of a plaintiff in <u>Boettcher v. Astrue</u>, 2012 WL 1181844 (W.D. Wash March 13, 2012) where the ALJ wrote "[a]lthough the claimant described fairly limited activities, two factors weigh against considering these allegations to be strong evidence supporting a finding that the claimant is disabled.  First the allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainly.  Second, even if the claimant's daily activities are as truly limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.  Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision." <u>Id.</u> at *4.  The <u>Boettcher</u> court found that the ALJ's explanation did not support an adverse credibility finding. <u>Boettcher</u>, 2012 WL 1181844 at *6.  The <u>McKim</u> court stated that this suggested "the language used to reach

1   that the Ninth Circuit has specified "the two grounds for using daily activities to form the basis

2   of an adverse credibility determination: (1) whether or not they contradict the claimant's other

3   testimony and (2) whether or not the activities of daily living meet "the threshold for transferable

4   work skills." Id. at 5. (citing Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007)).  Like the ALJ in

5   McKim, the ALJ in the instant matter failed to find "any specific contradiction between plaintiff's

6   other testimony and her activities of daily living and did not indicate specifically that her activities

7   of daily living were transferable work skills." Id. (citing Orn, 495 F.3d at 639; see also Fair v.

8   Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).  Accordingly, this Court finds that the ALJ failed to

9   properly consider Plaintiff's daily activities when evaluating her credibility.

10                        E.      Gaps in Treatment

11          The ALJ found Plaintiff to not be credible because "gaps in treatment" indicate that

12   Plaintiff's "symptoms and limitations have not been as serious as has been alleged." AR at 19.

13   An "ALJ may determine a claimant's statements are 'less credible if the level or frequency of

14   treatment is inconsistent with the level of complaints'". Kimzey v. Commissioner of Social Sec.,

15   2011 WL 1230818, *19 ((E.D.Cal., March 30, 2011) (quoting SSR 96–7p, 1996 SSR LEXIS 4, at

16   *21); see also Hankins v. Astrue, 2012 WL 4364142, *5 (E.D. Cal., Sept. 21, 2012) (stating that

17   "[a]n ALJ may discredit a Plaintiff's testimony for lack of consistent treatment").  "When rejecting

18   testimony for gaps in treatment, an ALJ "must not draw inferences about an individual's

19   symptoms and their functional effects … without first considering any explanations that the

20   individual may provide, or other information in the case record, that may explain infrequent or

21   irregular medical visits or failure to seek treatment.'" Kimzey, 2011 WL 1230818 at *19 (quoting

22   SSR 96–7p, 1996 SSR LEXIS 4, at *22).  For example, the Ninth Circuit has held gaps in treatment

23   do not constitute a clear and convincing reason for discounting credibility where the claimant

24   lacked the financial ability to pay for treatment. Orn, 495 F.3d at 638 (9th Cir. 2007).

25          Here, the ALJ does not provide any explanation for his finding that Plaintiff had

26

27   a factual determination in these instances is based more on an archived form than on the particular claimant who was
     before the ALJ." Id.

28

1   inappropriate gaps in her treatment.  He does not specify when the alleged gaps occurred or how

2   long they lasted.  Additionally, he does not state whether the alleged gaps in treatment are

3   related to Plaintiff's physical issues due to osteoporosis, her mental limitations due to Alzheimer's,

4   or both.  This Court's review of the medical records fails to reveal any significant gaps in Plaintiff's

5   treatment.  Specifically, the earliest medical records in the AR are from January 24, 2007.  Id. at

6   429.  There are records from March, April, May, July, August, October, November and December

7   2007.  Id. at 304-453.  There are also medical records from every month in 2008 with the

8   exception of July, September and October.  Id. at 292-595.  Plaintiff's records further show that

9   she met with a doctor on December 30, 2008 and every month from February - July and

10  September and November of 2009.  Id. at 492-681.  Plaintiff also had at least three appointments

11  in 2010 before her June hearing.  Id. at 131-134, 277-279, and 686.  The records do not all focus

12  on issues related to osteoporosis or Alzheimer's, but Plaintiff consistently seeks treatment from

13  her health care providers throughout the period of her alleged disability.

14          In light of the ALJ's lack of explanation regarding the alleged gaps in treatment and the

15  Court's review of the medical records, Plaintiff's alleged "gaps in treatment" do not constitute a

16  clear and convincing reason for rejecting Plaintiff's testimony.

17                  F.    Miscellaneous

18          Finally, the ALJ found that Plaintiff lacked credibility due to the fact that "[t]here is no

19  twelve month period where the [Plaintiff's] limitations provided disability," Plaintiff completed the

20  DMV form and passed her driver's test in July 2009, and Plaintiff was able "to participate in the

21  administrative hearing and respond to the questioning without any apparent difficulties."  Id. at

22  19.

23          The ALJ fails to provide any explanation as to the applicability of these statements or

24  observations to Plaintiff's credibility.  Id. at 19.  The ALJ does not provide any justification for his

25  first statement.  He does not indicate the time periods that he finds Plaintiff was disabled or not

26  disabled, nor does he explain how these time periods indicate a lack of credibility.

27          The ALJ also fails to explain how Plaintiff's ability to pass her driving test undermines

28

Plaintiff's complaints of Alzheimer's and osteoporosis. Id. at 19. Plaintiff has been driving for many years and while she testified that her medical conditions causes her to sometimes get lost while driving, she did not state that she had any trouble with operating a car itself. Id. at 33-34, 36, 41, and 43.

The ALJ's observations of Plaintiff during her hearing also do not support his negative credibility finding. While an ALJ can include personal observations of a Plaintiff during a hearing, a negative credibility determination based on those observations will only be proper if it is supported by other evidence. Larsen v. Asture, 2011 WL 3359676, *9, (E.D. Cal. Aug. 3, 2011) (citing Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986)). The ALJ stated that Plaintiff was able "to participate in the administrative hearing and respond to the questioning without any apparent difficulties," but failed to identify other evidence supporting his observations. As discussed above, the other reasons provided by the ALJ in support of his negative credibility determination do not constitute clear and convincing reasons to discount Plaintiff's subjective symptom testimony. In addition, the ALJ failed to explain how Plaintiff's participation in the hearing related to her Osteoporosis or Alzheimer's or both. See Kimzey, 2001 WL 1230818 at *20, (E.D. Cal. March 30, 2011) (finding that the ALJ 's personal observations of Plaintiff were not clear and convincing reasons supporting the adverse credibility determination where the ALJ "did not identify 'other' evidence that was consistent with his personal observation and did not address how Plaintiff's ability to participate in the hearing discredited Plaintiff's evidence related to his claimed mental impairment, a claimed physical impairment or both."); see also Rojas v. Astrue, 2011 WL 2563178, *7, (C.D. Cal. June 27, 2011) (finding that the ALJ erred by "discrediting plaintiff merely due to his attendance at and participation in his own hearing" and finding that the ALJ's reasoning was "akin to the so-called 'sit and squirm' test, in which an ALJ evaluates a plaintiff's credibility based on his or her demeanor at a hearing" and which the Ninth Circuit has disapproved of by noting that "[t]he fact that a claimant does not exhibit physical manifestations of [symptoms] at the hearing provides little, if any, support for the ALJ's ultimate conclusion that he claimant is not disabled or that his allegations … are not credible.").

1    The objective medical evidence supports the symptoms alleged by Plaintiff and does not

2   support the ALJ's credibility finding.  However, even if the medical evidence did support the ALJ's

3   finding, the medical evidence alone is not a sufficient reason for finding Plaintiff to be not credible

4   and as discussed above, none of the other reasons provided by the ALJ constitute a clear and

5   convincing basis for rejecting Plaintiff's subjective symptom testimony.

6   **C.    Remand v. Reversal**

7        "The decision whether to remand for further proceedings or simply to award benefits is

8   within the discretion of [the] court."  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).

9   "Remand for further administrative proceedings is appropriate if enhancement of the record would

10  be useful."  Benecke, 379 F.3d at 593.  On the other hand, if the record has been fully developed

11  such that further administrative proceedings would serve no purpose, "the district court should

12  remand for an immediate award of benefits."  Id.  "More specifically, the district court should

13  credit evidence that was rejected during the administrative process and remand for an immediate

14  award of benefits if (1) the ALJ failed to provide legally sufficient reasons for rejecting the

15  evidence; (2) there are no outstanding issues that must be resolved before a determination of

16  disability can be made; and (3) it is clear from the record that the ALJ would be required to find

17  the claimant disabled were such evidence credited."  Id. (citing Harman v. Apfel, 211 F.3d 1172,

18  1178 (9th Cir. 2000), McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002), and

19  Smolen, 80 F.3d at 1292).  The Ninth Circuit has not definitely stated whether the "credit-as-true"

20  rule is mandatory or discretionary.  See Vasquez v. Astrue, 572 F.3d 586, 593 (9th Cir. 2009)

21  (acknowledging that there is a split of authority in the Circuit but declining to resolve the conflict);

22  Luna v. Astrue, 623 F.3d 1032, 1035 (9th Cir. 2010) (finding rule is not mandatory where "there

23  are 'outstanding issues that must be resolved before a proper disability determination can be

24  made'"); Shilts v. Astrue, 400 Fed. Appx. 183, 184-85 (9th Cir. Oct. 18, 2010) (explaining that

25  "evidence should be credited as true and an action remanded for an immediate award of benefits

26  *only if* [the Smolen test is satisfied]").

27        Here, the ALJ has failed to provide legally sufficient reasons for rejecting Plaintiff's

28

evidence, there are no outstanding issues that must be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled were Plaintiff's evidence credited. See Benecke, 379 F.3d at 593; see also Orn, 495 F.3d at 640 (citing Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003); accord McCartey, 298 F.3d at 1076–77. Therefore, this Court **RECOMMENDS REVERSING** the decision of the ALJ and **REMANDING** for calculation of benefits.

### CONCLUSION

For the reasons set forth above, this Court finds that the ALJ's reasons for rejecting the functional capacity assessment of Plaintiff's treating physician and Plaintiff's subjective symptom testimony are not based on substantial evidence and are legally insufficient.  Accordingly, this Court **RECOMMENDS** that Defendant's cross-motion for summary judgment be **DENIED** and Plaintiff's motion for summary judgment be **GRANTED** and that this case be **REVERSED AND REMANDED** for calculation of benefits.

**IT IS HEREBY ORDERED** that any written objections to this Report and Recommendation must be filed with the Court and served on all parties no later than **April 3, 2013**. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **April 24, 2013**.  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  March 13, 2013

BARBARA L. MAJOR
United States Magistrate Judge

28                                                12cv992-WQH (BLM)